**Erskine CALDWELL, Charles Miller, Charles E. Marshall, and Reginald C. Johnson, Plaintiffs,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION LOCAL 1694, Defendant.**

**Civ. A. No. 83–828 JRR.**

United States District Court, D. Delaware.

Oct. 7, 1988.

---

Jacob Kresthool, Wilmington, Del., for plaintiffs.

Sidney Balick, Wilmington, Del., for defendant.

ROTH, District Judge.

This action is brought under the Labor–Management Reporting and Disclosure Act (the LMRDA or the Act), 29 U.S.C. § 412. It was filed on November 28, 1983, by four members of the International Longshoremen's Association (ILA), claiming defendant ILA Local 1694 had interfered with plaintiffs' right to free speech under the LMRDA, 29 U.S.C. § 411(a)(2), and had wrongfully ordered their expulsion from Local 1694 in violation of 29 U.S.C. § 529. Plaintiffs sought to enjoin defendant's agents, servants, and employees from interfering with and depriving them of their rights under the Act; they also sought damages including punitive damages. On January 13, 1984, a temporary restraining order was denied by this Court, following a representation by Arthur Wilson, then President of Local 1694, that no action would be taken on the expulsion order until after plaintiffs' appeal from that order had been heard and decided by the Atlantic Coast District of the ILA. The Atlantic Coast District overturned the expulsion order on April 16, 1984. A non-jury trial was finally held in this case on March 28–31, 1988. Pursuant to Fed.R.Civ.P. Rule 52(a), the Court now makes the following findings of fact and conclusions of law.

I. *Findings of Fact*

The ILA is a labor union affiliated with the AFL–CIO. Defendant Local 1694 is a local union of the ILA, having approximately 250 members. Local 1694 has its principal office in New Castle County, Delaware. The Local acts as the collective bargaining representative for employees of employers in an industry affecting commerce within the meaning of § 3(j)(2) of the LMRDA, 29 U.S.C. § 402(j)(2), and is, therefore, a labor organization engaged in an industry affecting commerce, pursuant to § 3(j). At all relevant times, Local 1694 held a charter from the ILA and was governed by the provisions of the ILA Constitution.

Plaintiffs, Erskine Caldwell, Charles Miller, Charles E. Marshall, and Reginald C. Johnson, are members of Local 1694 and work as longshoremen at the Port of Wilmington. On January 19, 1983, a newspaper, the "Delaware Valley Star," published a letter written by the plaintiffs as members of the Progressive Labor Organization, Local 1694 ILA (PLO). The letter was highly critical of Arthur "Skinny" Wilson, president of Local 1694, of the other leaders of the local, and of their policies and administration. In the letter, plaintiffs described Skinny Wilson as a dictator, called the other leaders of Local 1694 his "court of clowns," and pointed out that Local 1694's lack of an Executive Board was "a clear violation of the ILA constitution."

On January 26, 1983, Local 1694 held a special membership meeting for the announced purpose of nominating delegates to an ILA "Wage Scale Meeting." At least

55 members were present; Arthur Wilson presided. Prior to the meeting, Walter Jones had been circulating a petition, asking that disciplinary action be taken against plaintiffs because of their letter. About 80 members had signed the petition. At the outset of the meeting, Arthur Wilson turned the floor over to Walter Jones, who talked about his proposal and the number of signatures he had acquired. There was a great deal of yelling and shouting among the members. The majority wanted to take immediate action. The plaintiffs attempted to defend the letter.

After a period of loud discussion, William H. "Bunny" Allen, Jr., took the floor and read Article XVIII of the ILA Constitution to the members. The pertinent sections of Article XVIII provide that the term "discipline" includes "a fine, removal from office or job, disqualification to run for office, or suspension or expulsion from membership ..."; a member of the Local who has engaged in conduct "detrimental to the welfare of the I.L.A." is subject to discipline "after notice of and opportunity for hearing upon charges"; it is the Executive Board of the Local which has the power to discipline. Because Local 1694 did not have an Executive Board, Allen proposed that a Disciplinary Board (the Board) be picked to handle the matter. Names of candidates for the board were shouted from the floor. Nine men were selected, including William Allen as chairman, Walter Jones, and Pat Cooke.

Allen testified at the trial before this Court that, when he was selected by the members of Local 1694 to be Chairman of the Disciplinary Board, it was his opinion that the Board should take some form of action against the PLO to make it discontinue disrupting meetings and stop broadcasting in-house matters outside. Pat Cooke testified at trial that, at the time of his selection as a member of the Board, he had already signed Walter Jones's petition.

On February 10, 1983, plaintiffs wrote to the International President of the ILA, expressing their concerns about the manner in which the Disciplinary Board had been selected and about the propriety of disciplining union members for expressing their views in a newspaper article. On March 22, 1983, Thomas W. Gleason, Esq., the attorney for the ILA International, replied to this letter. A copy of Gleason's letter was also sent to Arthur Wilson. Gleason stated in his letter that disciplinary hearings of local members must be held by the Executive Board of the Local, that the members of the Executive Board must be selected by secret ballot, and that members of the ILA are entitled to the freedom of speech and assembly rights accorded under the LMRDA.

However, on March 4, 1983, prior to the response from Gleason, plaintiffs each received written notice from W.H. Allen, Jr., as "Chairman, Disciplinary Board, ILA Local 1694," directing them to appear for a hearing on March 14, 1983. The charges against plaintiffs were described as:

Purpose of Hearing: A charge has been brought against you for violation of I.L.A. Constitution, Article XVIII (B), in that you are accused of "Misconduct and conduct detrimental to the welfare of I.L.A. Local 1694," in that you did on January 19, 1983, have published in the Delaware Valley Star, a community newspaper of broad circulation, a letter falsely and maliciously charging officials of this local with misconduct, thereby bringing such charges to the attention of the general public tending to bring the Local into public disrepute and, generally, "washing Local linen in public." Not only were the charges untrue but they published false facts to the general community without any proper or constructive purpose.

Further, in violation of Said Constitution, Article XVIII, Section 1 through 4, you did improperly and without any authorization whatsoever, use the name and initials of the International Longshoremens Association (I.L.A.) in connection with your efforts to cause dissention with this Local, and to publicize and spread false reports concerning members of this Local to the general public.

Plaintiffs appeared at the hearing on March 14 and submitted written objections

to the proceedings. Plaintiffs argued that the Disciplinary Board was not properly constituted and that their article in the "Delaware Valley Star" was not detrimental to the ILA. They urged that Local 1694 follow the ILA Constitution, form an Executive Board, eliminate double standards and favoritism, and establish a financial institution to serve and aid longshoremen and their families in emergencies.

At the hearing on March 14, plaintiffs had the opportunity to read aloud their written objections, to plead not guilty to the charges and to present their views. After the plaintiffs left, the Board deliberated and Chairman Allen drafted proposed findings and recommendations.

On March 15, 1983, the evening following the Disciplinary Board hearing, Allen presented the findings and recommendations of the Board to a meeting of the membership of Local 1694. The Board had found plaintiffs "guilty" of both charges, recommended their immediate expulsion from Local 1694, and further recommended that plaintiffs no longer be represented by Local 1694, that they no longer attend any of Local 1694's activities or functions, that their names be removed from Local 1694's Roster, that upon expiration of the current contract on September 30, 1983, their names be removed from their "Assigned Gang's Roster," [1] and that "Dues Check-off" be discontinued from any further wages. The Board also recommended that plaintiffs not be refused the "Right to Work." The members voted to go along with the recommendations of the Board.

At this time President Arthur Wilson told the members that he was going to let this matter run its course and let the plaintiffs appeal what the members had voted. Wilson also told the members that he had talked to lawyers and plaintiffs had the right to work.[2] Wilson acknowledged, when he testified at the trial before this Court, that he was aware on March 15, 1983, from discussions with ILA attorney Thomas Gleason that plaintiffs had a right to speak out and to express themselves. Wilson did not attempt to prevent the membership vote; however, he did testify at trial that in general, if a motion was made and it seemed right to him, he'd put it to the membership for a vote; if it didn't seem right, he'd ask that it be withdrawn.

Plaintiffs received formal notice of the decision of the Board and the members and of their right to appeal by a letter, dated March 22, 1983. The letter stated that plaintiffs' would not be refused their "Right to Work" [3] but it did not mention any stay of any of the designated sanctions.[4] Plaintiffs did appeal to the Philadelphia District Council, which voted unani-

---

1. Dock work under the jurisdiction of Local 1694 is performed by "gangs" under the direction of a foreman. A longshoreman who is assigned to the roster of a specific gang has greater opportunity for work and earnings than one who is not assigned to a gang roster.

2. The minutes of the March 15 meeting record this portion of the proceedings as follows:

    Mr. Wilson—Looks like I have to make a decision. It's got to come to a test one way or the other, I'm going to hold with the decision of this membership and the trial board. After talking to lawyers the men (PLO) have the right to work, let it be stated that I hold with asking the membership to decide for themselves, I could not have the executive committee [sic] who has already been accused of impartiality [sic] to try these men.

    Our President has made a decision concerning the disciplinary action, I motion that we let this action run its course, and move on to new business. 2nd by C. McManus & others.

    It has been motioned to let this action run its course. Any unreadiness. All in favor say

Aye—the Ayes have it. The group has the right to appeal and they know where to send them.
(Plaintiff's Trial Exhibit 38).

3. Longshoremen are hired to work at the Port of Wilmington through the Local 1694 hiring hall. Under these circumstances, a union violates 29 U.S.C. § 158(b)(2) if it causes an employer to refuse employment or otherwise discriminate against non-union applicants. *Operating Engineers v. NLRB*, 321 F.2d 130, 134 (2d Cir.1963). Therefore, defendant could not have legally refused plaintiffs their "right to work" even if they were to be immediately expelled from Local 1694.

4. Article XIX, Section 4, of the ILA Constitution provides that an appeal "shall not operate to stay the action or decision appealed from unless the body to which the appeal is taken shall so order." No such stay was ordered on plaintiffs' appeal.

mously to sustain the actions of Local 1694. On August 11, 1983, plaintiffs appealed the decision of the Philadelphia District council to the Atlantic Coast District Council of the ILA. On April 26, 1984, the Atlantic Coast District Council reversed the disciplinary action against plaintiffs, stating that:

> Local 1694 was without power to discipline [plaintiffs] for the letter which they wrote to the Delaware Valley Star. Because of the insufficiency of the first charge and because we found no evidence of the unauthorized use of the name ILA, we recommend that the decision of the District Council and the Local be reversed and the charges dismissed.

The Atlantic Coast District added a footnote to the above, encouraging "Local 1694 to adopt by-laws for its own government as required by Article XII, Sec. 5 of the ILA Constitution and also to provide for an Executive Board as required by Article XIII, Sec. 1."[5] John Bowers, Executive President of the ILA, was chairman of the committee which recommended to the Executive Board of the Atlantic Coast District that the charges against plaintiffs be dropped. Arthur Wilson testified in this Court that he had recommended to Bowers that Bowers do nothing towards plaintiffs. However, Wilson as president of Local 1694 made no apparent effort, despite his awareness of the free speech rights of union members, to prevent Local 1694 from pressing the charges or to cut short the appeal process and concomitant threat of expulsion from the union that plaintiffs were facing.

Prior to the decision of the Atlantic Coast District, plaintiffs filed the action in this Court on November 28, 1983. The

expiration date of their current contract, at which time plaintiffs' names would be removed from their "Assigned Gang's Roster," had been moved up from September 30, 1983, to January 15, 1984. As we have mentioned above, plaintiffs sought at that time to enjoin their expulsion from the Local as well as to protect their rights under the LMRDA. At the preliminary injunction hearing, Arthur Wilson assured this Court that no action would be taken on the expulsion until after plaintiffs' appeal to the Atlantic Coast District had been decided. He did not at that time, however, make any reference to his discussion with Gleason about the charges or to his knowledge that plaintiffs had the right to express themselves in the manner that they had. These facts were made known to the Court only at the time of Wilson's later testimony on March 30, 1988.

In order to reverse the disciplinary vote of Local 1694, plaintiffs had to appeal to the Philadelphia District Council and the Atlantic Coast District Council in New York. Attendance at these appeal hearings caused plaintiffs to lose time and wages from work as follows: Philadelphia, each plaintiff $113; New York, each plaintiff $113, plus $5 each for gas and $4 each for parking, for a total of $940.[6]

Arthur Wilson resigned as president of Local 1694 in September 1988 due to serious illness.

## CONCLUSIONS OF LAW

■ It is our determination first of all that the statements made by plaintiffs in their letter, published in the "Delaware Valley Star," were protected by the LMRDA.

5. On May 9, 1984, Arthur Wilson, as president of Local 1694, notified the members in writing that nominations for an Executive Board for Local 1694 would take place on May 31, 1984, and elections would be held on June 19, 1984. Five members were elected by secret ballot at that time and since then Local 1694 has had a duly constituted Executive Board.

6. During the period between the publication of plaintiffs' letter in the "Delaware Valley Star" and the dismissal of the charges against them by the Atlantic Coast District, plaintiffs claim that there were specific occasions when they were

present and available for work at the Local 1694 hiring hall and that non-union members were given preference in hiring over them. Plaintiffs filed a grievance in October 1984 with the Philadelphia Marine Trade Association. They are represented in this claim by the Union attorney. Any recovery under this grievance will come from the employer-stevedoring companies. The matter of the loss of these wages is not, therefore, considered by the parties to be an item of loss to be taken into account in the action now before us.

The LMRDA of 1959 was designed to protect the rights of union members to discuss freely and criticize the management of their unions and the conduct of their officers. The legislative history and the extensive hearings which preceded the enactment of the statute abundantly evidence the intention of the Congress to prevent union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain.

*Salzhandler v. Caputo*, 316 F.2d 445, 448–49 (2d Cir.1963).

To subject plaintiffs to discipline for exercising their right to freedom of speech violates the LMRDA, specifically 29 U.S.C. § 411(a)(2), (5) and § 529.[7] *Semancik v. United Mine Workers of America Dist. #5*, 466 F.2d 144 (3d Cir.1972).

Defendant argues that plaintiffs here were not "disciplined" because no disciplinary action was to be taken on the recommendations of the Disciplinary Board until all rights of appeal had been exhausted and because there was no change in the status of plaintiffs pending that decision. Defendant does not deny that expulsion is discipline but contends that, because that recommendation was never carried out, plaintiffs were not disciplined.

Discipline under the LMRDA has been defined as union action which adversely affects a member but only when

(1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing.

*Miller v. Holden*, 535 F.2d 912, 915 (5th Cir.1976).

It is clear that the vote of the Local 1694 membership to adopt the recommendations of the Disciplinary Board is union action undertaken under color of the union's right to control members' conduct. The question we must decide in whether that action directly penalized plaintiffs in the manner set forth in *Miller*. If the recommendations of the Local 1694 Disciplinary Board were never put into effect during the pendency of the appeal and were reversed and the charges against plaintiffs dismissed by the decision of the Atlantic Coast District, were plaintiffs, in effect, disciplined? Were they penalized in a way which separated them from comparable members in good standing?

■ If one should deem the recommendations, prior to their enforcement, to be merely a reprimand or a slap on the wrist, such a sanction is not considered discipline under 29 U.S.C. § 411(a)(2), (5) or § 529. *Cf. Rekant v. Shochtay–Gasos Union Lo-*

---

7.  § 411. Bill of rights; constitution and by-laws of labor organizations

. . . . .

**(a)(2) Freedom of speech and assembly**
Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

. . . . .

**(5) Safeguards against improper disciplinary action**
No member of any labor organization may be fined, suspended, expelled, ·or otherwise disciplined except for nonpayment of dues by such organization or by an officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

**§ 529. Prohibition on certain discipline by labor organization**
It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of Section 412 of this title shall be applicable in the enforcement of this section.

*cal 446*, 320 F.2d 271, 277 (3d Cir.1963) (slap on the wrist cannot be raised to the level of a "fine, suspension or expulsion"); *Bougie v. Lake County, Indiana, District Council*, 57 Lab.Cas. (CCH) ¶ 12,435 (N.D. Ind.1968) (a reprimand is not "otherwise disciplined" within the meaning of the statute); *accord Perales Vara v. Laborers' International Union, Local 89*, 662 F.Supp. 492, 495 (S.D.Cal.1987). "[T]he courts have not been receptive to cases of formal discipline which result in no punishment other than a reprimand or threat of future punishment." Etelson and Smith, *Union Discipline Under The Landrum–Griffin Act*, 82 Harv.L.Rev. 727, 731 (1969).

However, in a situation in which the union action, designed to control a member's conduct, interferes with the member's employment opportunities, such interference may constitute discipline. *Maier v. Patterson*, 511 F.Supp. 436, 444 (E.D.Pa.1981). *Cf. Bougie, supra* (employee not "disciplined" in a case of reprimand where no lost wages resulted from the reprimand).

▪ Pursuant to the above standards, we find that the plaintiffs were disciplined by Local 1694. We have reached this conclusion because of a number of factors present in this case. First of all the officers of the Local, specifically the president, were aware prior to the meeting of March 15, 1983, that plaintiffs' letter was protected speech. Arthur Wilson did nothing to prevent plaintiffs from being subjected to the vote to discipline them although it was his admitted practice to have motions "that didn't seem right" withdrawn from membership vote. In addition, if plaintiffs had not chosen to appeal, they would have been expelled from the union. Because they did appeal, they had to undergo a fifteen-month period during which they could not know from day to day whether the expulsion decree would be enforced or whether it would ultimately be reversed by the appeal. Free speech cannot flourish in such an atmosphere. Furthermore, plaintiffs' efforts to bring about changes in the leadership

and policies of Local 1694 had to have been affected by the uncertainty of their status pending the outcome of the appeal. The limbo in which they were placed for those fifteen months directly affected them in a way which separated them from comparable members in good standing.

We find further evidence of discipline in the wages plaintiffs were forced to give up in order to attend the appeal hearings in Philadelphia and New York. This loss of wages was caused directly by the actions of the union, as opposed to being caused by any action by the employer.[8] *Compare Turner v. Local Lodge No. 455*, 528 F.Supp. 1008, (N.D.Ala.1981), *aff'd*, 755 F.2d 866 (11th Cir.1985) (union members, benched 90 days for failure to cross illegal picket lines, were not "disciplined" under § 411(a)(2), (5) because union acting ministerially under duty to contractor) *with Detroy v. American Guild of Variety Artists*, 286 F.2d 75 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961) (union blacklisting of member which affected prospects for future employment held to be "discipline" under § 411(a)(5)).

The element which makes such union action discipline is that it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its members as a whole even though the actual effect of the discipline is limited to the member's employment status.

Etelson and Smith, *supra* at 734.

▪ Having found that plaintiffs were disciplined in retaliation for their exercise of their protected right to free speech, we do not need to consider the issue of the propriety of the method of discipline. Were this an issue, however, we would be prepared to find that plaintiffs were not granted a full and fair hearing because the Disciplinary Board was not constituted in accordance with the requirements of Article XVIII of the ILA Constitution.

As a remedy for their wrongful discipline, plaintiffs seek compensatory and punitive damages, costs and counsel fees, and equitable relief, enjoining defendant, its

---

8. *See* note 5, *supra*, for a description of the actions taken by plaintiffs to resolve their

claims for wage loss caused by actions of the employers.

agents, servants, employees, members and all persons in active concert or participation with them from interfering with plaintiffs' exercise of their rights under the LMRDA.

■ We will award plaintiffs their compensatory damages in the amount of $940 as set out in detail *supra*.[9] In regard to the punitive damages, we do not find such an award to be appropriate under the present circumstances. Any willfulness or recklessness in the disregard of plaintiffs' free speech rights would appear to have been on the part of the officers, particularly the president, and not on the part of the members of Local 1694. The members were excited and disruptive at the meetings at which plaintiffs' conduct was discussed and the recommendations voted upon. However, it would appear that they did not deliberately disregard their constitution and that any future violation could be prevented by informing the members of their LMRDA rights rather than by finding their treasury. As for the president, he has recently resigned. It would serve no future palliative purpose to charge the president now for his past conduct; nor should his successor in office pay for the predecessor's acts. *See* Etelson and Smith, *supra*, at 769–70.

■ Concerning the education of the members about their LMRDA rights, we will grant plaintiffs' prayer for injunctive relief by directing that each member of Local 1694 be provided with a copy of his/her rights under 29 U.S.C. § 411(a)(2) and by directing that a copy of these rights be permanently posted in a conspicuous location in the Local 1694 union hall.

■ Because we find that this litigation was necessitated by defendant's president's willful disregard of plaintiffs' free speech rights, we will, pursuant to 29 U.S.C. § 412, award plaintiffs their costs in this action, including attorneys' fees.

An appropriate order will follow.

---

9. Plaintiffs also seek an award for their loss of wages caused by their attendance at the trial before this Court. We find no authority to support such an award and will not consider it.